UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                       :

MARTELL STRATEGIC FUNDING LLC,     :
                                                       :

                           Plaintiff,     :           12-CV-627 (VSB)

TRAINING BEAM EDUCATION, LTD.,    :
                                                       :        **OPINION & ORDER**

                         Intervenor,   :

               - against -       :

AMERICAN HOSPITALITY ACADEMY,   :
et al.,                                       :

                        Defendants.  :
                                                       :
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/14/2019__

Appearances:

Evan Ross Shusterman
Robert L. Rimberg
Joel Steven Schneck
Kelly Christine Griffin
Goldberg & Rimberg, PLLC
New York, NY

Efrem Tobias Schwalb
Koffsky Schwalb LLC
New York, NY
*Counsel for Plaintiff*

Jonathan David Bachrach
Law Offices of Jonathan D. Bachrach, P.C.
New York, NY
*Counsel for Intervenor Plaintiff*

Simcha David Schonfeld
Koss & Schonfeld, LLP
New York, NY

Jacob Schindelheim
K&L Gates
Washington, DC
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiff Martell Strategic Funding LLC ("MSF") brings this action against Defendants American Hospitality Academy ("AHA") and Cindi Reiman asserting claims for breach of contract, breach of fiduciary duty, specific performance, and declaratory judgment, along with Intervenor Plaintiff Training Beam Education, Ltd. ("TBE") asserting claims for breach of contract, unjust enrichment, and fraudulent inducement. Before me is Defendants' motion for summary judgment with regard to all remaining claims in this matter, and Plaintiff's cross motion for partial summary judgment. For the reasons stated herein, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

## I.    <u>Background</u>[1]

MSF is in the business of providing advisory and consulting services—including financing, licensing, strategic business planning, and global expansion—to enterprises. (Pl.'s 56.1 ¶ 1.)[2] Michael Milea is the sole member of MSF. (Defs.' 56.1 ¶ 9.)[3] AHA is a hospitality education training company based in Hilton Head, South Carolina. (*Id.* ¶ 1.) Reiman is the President and CEO of AHA. (*Id.* ¶ 2.) AHA licenses its name to schools around the world and

---

[1] I address only those facts pertaining to the remaining claims in this matter and that are relevant to this Opinion & Order. These facts are undisputed unless otherwise indicated.

[2] "Pl.'s 56.1" refers to Plaintiff's Statement Pursuant to Rule 56.1 and Defendants' responses thereto. (Doc. 262.) In compliance with my Individual Rules, Pl.'s 56.1 aggregates Plaintiff's statements and Defendants' responses and thus references in this Opinion & Order to individual paragraphs are to Plaintiff's statements, Defendants' responses, or some combination thereof.

[3] "Defs.' 56.1" refers to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 and Plaintiff's responses thereto. (Doc. 269.) In compliance with my Individual Rules, Defs.' 56.1 aggregates Defendants' statements and Plaintiff's responses and thus references in this Opinion & Order to individual paragraphs are to Defendants' statements, Plaintiff's responses, or some combination thereof.

those schools in turn pay AHA a fee equal to a percentage of the tuition collected. (*Id.* ¶¶ 4, 5.) TBE is an education provider in China specializing in international cultural and educational exchange, language, and industry training, that creates, operates, and sells educational content to Chinese schools for corporate training purposes. (*Id.* ¶¶ 4–6.) The principals and managers of TBE are or were William Crampton and Linda Li. (*Id.*)

On or about August 2, 2011, Plaintiff and Defendants entered into an agreement relating to advisory and consulting services to be performed by MSF in connection with any business Defendants conducted in China (the "China Advisory Agreement"). (Pl.'s 56.1 ¶ 2.) The China Advisory Agreement identified services previously performed by MSF for the benefit of Defendants, including but not limited to, developing Defendants' relationship with TBE, and conducting due diligence on TBE. (*Id.*) The China Advisory Agreement provided for a fifty percent payment of gross revenues received by Defendants for China-related business to MSF, and Defendants also agreed to pay MSF fifty percent of gross revenue received by Defendants as to any business done anywhere in the world with TBE's principals. (*See id.*)

In or about May 2011, Plaintiff introduced Defendants to Crampton and Li who expressed interest in using AHA products in China to provide hospitality and culinary arts training to students. (*Id.* ¶¶ 4–6.) On August 16, 2011, Plaintiff, Defendants, and TBE entered into an agreement (the "China License Agreement" and, together with the China Advisory Agreement, the "China Agreements"), pursuant to which TBE was given an exclusive license to use materials produced by AHA in China to develop and provide training in the areas of hospitality management and culinary arts and for students to obtain AHA diplomas. (*Id.* ¶ 2.) The China License Agreement set certain license fees that were to be paid by TBE to AHA and MSF over the course of a 10-year term of the agreement. (*See id.*)

On or about September 12, 2011, Plaintiff and Defendants executed the Martell Strategic Funding, LLC American Hospitality Academy Advisory, Fee and Non-Circumvent Agreement-Hilton Head School (the "Hilton Head Agreement") and the Martell Strategic Funding, LLC American Hospitality Academy Advisory, Fee and Non-Circumvent Agreement for Brazil (the "Brazil Agreement").  (*Id.* ¶ 3.)  As part of the Hilton Head Agreement Plaintiff agreed to provide certain advisory and consulting services in connection with any business Defendants conducted in the United States and Canada.  (*See id.*)  In return, Defendants agreed to pay Plaintiff fifty percent of the gross revenues or any other compensation generated by all business done pursuant to the agreement.  (*Id.*)  Pursuant to the Brazil Agreement, Plaintiff agreed to provide Defendants advisory and consulting services related to any business conducted by Defendants in Brazil, in exchange for payment from Defendants of fifty percent of the gross revenues or any other compensation generated by all business done pursuant to the agreement. (*Id.*)

II.     **Procedural History**

Plaintiff commenced this action on November 16, 2011 in the Supreme Court of the State of New York, County of New York.  (*See* Doc. 1.)  On January 25, 2012, Defendants removed the case to this Court.  (Doc. 1.)[4]  On May 1, 2012, Plaintiff filed an amended complaint.  (Doc. 9.)  On September 29, 2012, TBE filed a motion to intervene in this action, (Doc. 32), which was granted on September 4, 2013, (Doc. 67).

On March 26, 2013, Defendants filed a motion to dismiss Plaintiff's amended complaint. (Doc. 56.)  On September 4, 2013, Judge Carter granted the motion in part and denied it in part,

---

[4] This case was initially assigned to Judge Andrew L. Carter, Jr.  It was reassigned to me on January 29, 2014.  (*See* Doc. 79.)

dismissing counts three (breach of the China Advisory Agreement), four (breach of fiduciary duty), and six (declaratory judgment stating that the Hilton Head Agreement, the Brazil Agreement, and the China Advisory Agreement are in full force and effect and are binding on Defendants and MSF, and Defendants' termination of the China License Agreement was without force) of the amended complaint.[5]  (Doc. 67.)  On October 31, 2013, Defendants filed their answer to Plaintiff's amended complaint, (Doc. 72), and on May 30, 2014, filed an amended answer and counterclaims, (Doc. 101).  On April 15, 2015, Plaintiff answered the counterclaims. (Doc. 127.)

On December 17, 2013, TBE filed its intervenor complaint, (Doc. 75), and on May 19, 2014, filed an amended intervenor complaint, (Doc. 99).  On April 29, 2015, Defendants filed an answer and counterclaim to TBE's amended intervenor complaint.  (Doc. 120.)

On October 4, 2017, Defendants filed their motion for summary judgment and documents in support, (Docs. 247, 248, 250, 251), and Plaintiff filed its motion for partial summary judgment and documents in support, (Docs. 252–56).  On November 27, 2017, Defendants filed their opposition to Plaintiff's motion for partial summary judgment, along with their documents in support, (Docs. 261, 262), TBE filed an opposition to Defendants' motion, along with its documents in support, (Docs. 263–66), and Plaintiff filed its opposition to Defendants' motion, along with its documents in support, (Docs. 267–69).  On December 29, 2017, Defendants filed replies to both Plaintiff's motion for partial summary judgment, (Doc. 270), and TBE's opposition to Defendants' motion for summary judgment, (Doc. 271).  On December 29, 2017, Plaintiff filed a reply to Defendants' motion.  (Doc. 272.)

---

[5] Defendants move, in part, for summary judgment with regard to each of the claims that were previously dismissed. Defendants do not explain why they seek to dismiss these claims; therefore, I address Defendants' summary judgment arguments only as they pertain to claims that remain in this action.

### III.    <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists. *Id.* at 256. If satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.*, and to present such evidence that would allow a jury to find in its favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the

motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## IV. <u>Discussion</u>

Defendants move for summary judgment arguing that (1) the claims filed by Plaintiff against Reiman personally should be dismissed, (2) Plaintiff's causes of action for breach of contract should be dismissed, (3) TBE's causes of action for breach of contract, unjust enrichment, and fraudulent inducement should be dismissed, and (4) TBE is not a valid party to this action. Plaintiff cross moves asserting that it is entitled to summary judgment on its breach of contract claims. I address each of these arguments below.

### A. *Plaintiff's Claims against Reiman in Her Individual Capacity*

Defendants move for summary judgment seeking dismissal of Plaintiff's remaining claims—for breach of the China Advisory Agreement (Count 1), breach of the Hilton Head Agreement and Brazil Agreement (Count 2), and breach of the China License Agreement (Count 5)—against Reiman personally.

## 1. China License Agreement

As its fifth cause of action, Plaintiff alleges that, in addition to AHA, Reiman breached the China License Agreement.[6] (Pl.'s Am. Compl. ¶¶ 170–75.)[7] Defendants contend that there is no basis for liability against Reiman personally because Reiman was not a party to the agreement and she did not sign the agreement in her individual capacity. (Defs.' Mem. 3–4.)[8] In response, Plaintiff states, without providing any legal support, that "by signing the agreements in her individual capacity, as the owner and President of AHA, Reiman is liable for the breach of the China Agreements by Defendants." (Pl.'s Reply 2.)[9] Plaintiff appears to be combining—without explanation—Reiman signing in her individual capacity with her signing in her representative capacity as owner and President of AHA.

"Before [a party] may be held accountable for the breach of a contract, it must be demonstrated that [she] was a party thereto. Clearly a breach can only occur when one is under an obligation to perform in the first instance." *Stratton Grp., Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978) ("It is apparent from the contract in issue that [the individual defendant] was not a named party to the Agreement. Therefore, as a matter of law, he cannot be held accountable for the alleged breach."). It is axiomatic that "[b]ecause corporations are not natural persons, they must necessarily act through their officers and other duly authorized agents. Accordingly, under New York law, 'an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement unless there is clear and

---

[6] I note that TBE's causes of action for breach of contract and unjust enrichment are advanced against AHA only and not against Reiman personally.

[7] "Pl.'s Am. Compl." refers to Plaintiff's Amended Complaint, filed on May 1, 2012. (Doc. 9.)

[8] "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, filed on October 4, 2017. (Doc. 250.)

[9] "Pl.'s Reply" refers to Plaintiff's Reply Memorandum of Law in Support of Motion for Partial Summary Judgment, filed on December 29, 2017. (Doc. 272.)

explicit evidence of the agent's intention to substitute . . . [her] personal liability for, or to, that of [her] principal.'" *New World Trading Co. v. Avshalomov*, No. 11 Civ. 6219 (SAS), 2012 WL 4378055, at *4 (S.D.N.Y. Sept. 24, 2012) (quoting *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991)).[10]

The China License Agreement was entered into among AHA, MSF, TBE, and an entity not part of this litigation named Boston Language Learning, Inc. (*See* CLA 1.) Although Reiman signed the China License Agreement, she is not a party to the agreement. (*See id.* ("Agreement made this 16th day of August, 2011 by and between American Hospitality Academy . . . and Martell Strategic Funding, LLC . . . and Training Beam Education, Ltd. . . . and Boston Language Learning, Inc. . . . . ).) Furthermore, as evidenced by the agreement's signature page, Reiman signed the agreement on behalf of AHA rather than personally. Reiman's signature line is preceded by AHA's name, as well as the word "By," and her title— "President"—is listed under the signature line. (CLA 11; *see also eBC, Inc. v. Map Techs., LLC*, No. 09 Civ. 10357 (CS), 2011 WL 12847702, at *4 (S.D.N.Y. May 17, 2011) ("The fact that the corporate entity . . . is typed in boldface above [the individual defendants'] signature lines combined with the fact that it is followed by the word 'By' makes clear that the Agreement was between [the corporate entities] and that [the individual defendants] signed in a representative, rather than an individual, capacity.").)[11] Because it is clear that Reiman was not a party to the China License Agreement, and she signed the agreement in her representative capacity on behalf

---

[10] The China License Agreement contains a New York choice of law clause, (CLA 7 (stating that the agreement "shall, in its interpretation, application and enforcement be governed solely by the law of the State of New York in the United States without reference to its conflicts of law rules")), and the parties cite to New York law in their papers. Accordingly, I apply New York law when interpreting the terms of the agreement. "CLA" refers to the China License Agreement, attached as Exhibit F to the Declaration of Simcha D. Schonfeld, Esq. in Support of Defendants' Motion for Summary Judgment. (Doc. 248-6.)

[11] While the signature page of the China License Agreement is partially illegible, Defendants submit that Reiman signed the agreement only once, under the line for AHA, and no party objects to this fact.

9

of AHA rather than her individual capacity, Plaintiff's fifth cause of action must be dismissed insofar as it advances claims against Reiman personally.

### 2. China Advisory Agreement, Hilton Head Agreement, and Brazil Agreement

Plaintiff also asserts breach of contract claims against Reiman personally with regard to the China Advisory Agreement, Hilton Head Agreement, and Brazil Agreement.  (*See* Pl.'s Am. Compl. ¶¶ 132–49; *see also* Doc. 67 at 8–9.)  Defendants contend that these claims must be dismissed because none of the agreements impose any obligations upon Reiman individually. (Defs.' Mem. 4–7.)

As outlined above, under New York law, "an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement unless there is clear and explicit evidence of the agent's intention to substitute . . . [her] personal liability for, or to, that of [her] principal."  *Lerner*, 938 F.2d at 5 (internal quotation marks omitted).[12]  In assessing whether a signatory intended to be individually bound, courts typically consider the following five factors:  "length of the contract, the location of the liability provision(s) in relation to the signature line, the presence of the signatory's name in the agreement itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation."  *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994).  In addition to these factors, the most obvious indicator of the signatory's intent is the signature's form.  *Israel v. Chabra*, 537 F.3d 86, 97 (2d Cir. 2008).  "[W]here individual responsibility is demanded the nearly universal practice is that

---

[12] The China Advisory Agreement, Hilton Head Agreement, and Brazil Agreement all contain New York choice of law clauses.  (*See* CAA 3; HHA 5; BA 3.)  "CAA," "HHA," and "BA" refer to the China Advisory Agreement, Hilton Head Agreement, and Brazil Agreement, attached as Exhibits C, D, and E, respectively, to the Declaration of Simcha D. Schonfeld, Esq. in Support of Defendants' Motion for Summary Judgment.  (Docs. 248-3; 248-4; 248-5.)

the officer signs twice—once as an officer and again as an individual." *Id.* (quoting *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67 (N.Y. 1961)).

Unlike the China License Agreement, Reiman signed the China Advisory Agreement, Hilton Head Agreement, and Brazil Agreement twice—once on behalf of AHA and once "individually." (*See* CAA 3; HHA 6; BA 4.) Moreover, certain of the *Lollo* factors support a finding that Reiman intended to be individually bound by these agreements. First, the agreements at issue are between three and five pages—not long enough to bury fine print that might "trap" Reiman into being bound individually. *See, e.g.*, *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) (three pages); *Lehman Bros., Inc. v. Tutelar CIA Financiera, S.A.*, No. 95 CIV. 3772 (DLC), 1997 WL 403463, at *3 (S.D.N.Y. July 17, 1997) (one page); *Paribas Props., Inc. v. Benson*, 536 N.Y.S.2d 1007, 1009 (1st Dep't 1989) (three pages). Moreover, Reiman signed these agreements around the same time she signed the China License Agreement in her representative capacity, which lends support to the argument that she was aware of the difference between signing in her individual versus her representative capacity. Second, Reiman is mentioned by name in the agreements. Indeed, contrary to Defendants' contention that the agreements impose no obligations on Reiman, each agreement contains the following passage, or one similar to it:

> The Company shall open a new bank account in any major money-center bank, and under any company [name] selected by Cindi Reiman, other than any bank where the Company currently maintains an account. Cindi Reiman and Michael Milea shall each be individual signatories on said account. Nevertheless, Cindi Reiman shall be operationally responsible for making all payments and maintaining all records (e.g. authorized expenses and distributions) from said account required to be made hereunder.

(CAA 2; *see also* HHA 3; BA 2.)

Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable

inferences in Plaintiff's favor, I find that Defendants' motion for summary judgment regarding

Reiman's individual liability under the China Advisory Agreement, Hilton Head Agreement, and

Brazil Agreement must be denied.

### B. *Plaintiff's Claims for Breach of Contract*

Plaintiff and Defendants both move for summary judgment with regard to Plaintiff's

breach of contract claims pertaining to the China Agreements. Plaintiff argues that the evidence

demonstrates that Defendants anticipatorily breached or repudiated the agreements. Defendants

contend that Plaintiff has not provided sufficient evidence to ascertain the amount of damages

resulting from any such breach. I find that issues of fact exist and I decline to grant summary

judgment on either of these grounds.

### 1. Anticipatory Breach

Under New York law, to establish a breach of contract, a plaintiff must show "(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d

Cir. 1996). "Anticipatory repudiation occurs when, before the time for performance has arisen, a

party to a contract declares his intention not to fulfill a contractual duty." *Aristocrat Leisure Ltd.*

*v. Deutsche Bank Tr. Co. Ams.*, 618 F. Supp. 2d 280, 294 (S.D.N.Y. 2009) (internal quotation

marks omitted). In particular, "anticipatory repudiation occurs when there is an overt

communication of intention not to perform." *O'Shanter Res., Inc. v. Niagra Mohawk Power*

*Corp.*, 915 F. Supp. 560, 567 (W.D.N.Y. 1996) (internal quotation marks omitted). The

expression of a party's intention not to perform must be "positive and unequivocal." *Id.* "Once

a party has indicated an unequivocal intent to forego performance of his obligations under a

contract, there is little to be gained by requiring a party who will be injured to await the actual

breach before commencing suit . . . . However, it is clear that there must be a definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action." *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D.2d 262, 266–67 (1st Dep't 1995).

Plaintiff claims that, through certain communications with TBE, Defendants anticipatorily breached the China Agreements by, among other things, stating that they did not intend to fulfill their agreements with Plaintiff, attempting to damage Plaintiff's relationship with TBE, and working behind Plaintiff's back to develop business opportunities without intending to share the resulting revenues with Plaintiff. (Pl.'s Mem. 5.)[13]  In particular, Plaintiff points to the following emails, sent from Reiman to TBE:

- A December 14, 2011 email stating:

  Hi Bill and Linda—just so you know—this is what [Milea] has sent me prior to the email he sent to you all.  There is no way I will be talking to him ever again—I don't trust him at all and know he is only in this for the money and doesn't care one ounce about AHA or AHA China—he barely knows what we are all doing together. You two are the key players now in Michael and my lawsuit as I am now suing him to get him out of AHA China.  I don't have a problem paying him some type of "brokers fee" but to pretend he is doing anything for either of us and receiving 50% of that for the next 10 years is impossible for me.

  So any type of support for me would be appreciated.  PLEASE do not let him know I have showed you this email!!

- A December 27, 2011 email stating:

  Take your time on all your communication with Michael—it will really just be for me now as our attorneys said they don't really need it as they don't want it to look like they are representing you too.  Michael knows I am now filing a claim to dissolve our China contract based on his nonperformance and current breach of contract.

  I can't imagine it going to court—but if it does, it will be important for me to know

---

[13] "Pl.'s Mem." refers to Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment, filed on October 4, 2017.  (Doc. 253.)

the full extent of your interactions/or lack of interactions with Michael as well as where you felt mislead.

- A February 24, 2012 email stating:

  We are fine with signing a new agreement—AHA can draft or you can draft—or we don't sign anything for now until Michael is out of the picture!

(Pl.'s Mem. 7–8.)

Rather than finding that the above statements demonstrate an overt and unequivocal intention not to perform under the China Agreements, a finder of fact could plausibly determine that Defendants' statements indicate that Defendants intended to resolve their disputes through the judicial process. For example, Reiman states that "I am now suing him to get him out of AHA China," and "I am now filing a claim to dissolve our China contract," and "we won't sign anything for now until [Plaintiff] is out of the picture." In addition, the statements could also be read as Reiman expressing the belief that Milea was breaching the agreements: "Michael knows I am now filing a claim to dissolve our China contract based on his nonperformance and current breach of contract." Moreover, even if some of these communications could also be read as demonstrating an intention not to perform, there is no indication that Plaintiff knew about these emails prior to discovery and was thus aware of Defendants' supposed repudiation of the China Agreements.

Viewing these facts in the light most favorable to Defendants, and drawing all reasonable inferences in Defendants' favor, I find that a genuine issue exists as to whether Defendants clearly and unequivocally expressed an intention not to perform their contractual obligations and therefore deny Plaintiff's motion for summary judgment based on anticipatory breach of the China Agreements.

## 2. Damages

As outlined above, to establish a breach of contract claim, a plaintiff must show damages attributable to the breach.  *See, e.g.*, *Harsco Corp.*, 91 F.3d at 348.  Defendants contend that they are entitled to summary judgment with respect to Plaintiff's breach of contract claims because "there are no ascertainable or actual damages suffered by Plaintiff."  (*See* Defs.' Reply 9.)[14] However, Defendants' argument rests on the erroneous premise that proving actual damages is a prerequisite to succeeding on a breach of contract claim.  Under New York law, "[i]t is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."  *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also M'Baye v. World Boxing Ass'n*, No. 05 Civ. 9581(DC), 2009 WL 2245105, at *9 (S.D.N.Y. July 28, 2009) (finding that "[w]hile uncertainty remains about the amount and type of damages [plaintiff] would be entitled to, the existence of some damages (including nominal damages) is not entirely speculative" and denying defendant's motion for summary judgment to dismiss plaintiff's breach of contract claim); *C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc.*, 567 N.Y.S.2d 716, 718 (1st Dep't 1991) ("Even if it were shown that no actual damages have been sustained, plaintiff would seem entitled to proceed to trial at least on its contract cause of action[,] if only to vindicate its right to nominal damages."); *Hirsch Elec. Co. v. Cmty. Servs., Inc*., 536 N.Y.S.2d 141, 143 (2d Dep't 1988) (permitting breach of contract claim where claim for damages based on lost profits was too speculative to proceed to trial,

---

[14] "Defs.' Reply" refers to Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed on December 29, 2017.  (Doc. 270.)

because injured party was still entitled to recover nominal damages).

Thus, even assuming Plaintiff failed to demonstrate that it suffered actual damages as a result of any breach of the China Agreements—though I do not and need not reach any conclusion on that issue to decide the instant motion—Defendants have not shown that Plaintiff would not be entitled to nominal damages. Accordingly, Defendants' motion for summary judgment to dismiss the breach of contract claims based on Plaintiff's purported failure to demonstrate damages attributable to the breach is denied.[15]

## C.    *TBE as Intervenor*

Defendants move for summary judgment asserting that, based on evidence uncovered during discovery, TBE is not a proper party to this litigation. In support of their position, Defendants maintain that when Crampton filed the motion to intervene on behalf of TBE, Crampton had no relationship with, and no authority to act on behalf of, TBE because either TBE had been dissolved or because Crampton had sold the company to Xiafang Xie, a third party. (Defs.' Mem. 19–21.)

In support of their position, Defendants point to the following evidence: (1) Crampton's deposition testimony in which he stated that he opened TBE in 2000 and he and Li were the sole shareholders until the company was dissolved in 2012 or 2013; (2) Crampton's errata sheet correcting his deposition testimony to clarify that TBE was not dissolved and that Li owned shares of TBE; and (3) Crampton's April 20, 2016 sworn declaration in response to questions

---

[15] Defendants also move for summary judgment with regard to Plaintiff's claims originally brought for specific performance. (Defs.' Mem. 18–19.) As discussed in Judge Carter's ruling on Defendants' motion to dismiss, "specific performance is a remedy for a breach of contract claim, not a separate cause of action." (Doc. 67 at 8 (citing *RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 Civ. 5, 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011).) Consequently, Judge Carter ruled that Plaintiff's specific performance claims are "construed as a breach of contract claim" and that "MSF will be entitled to argue for this remedy in conjunction with its . . . breach of contract claims." (Doc. 67 at 8.) Accordingly, and because I decline to grant summary judgment for either party with regard to Plaintiff's breach of contract claims, a determination regarding the appropriate remedy for any breach may be determined by the finder of fact at a later proceeding.

posed by the Court, in which he stated that "[a]s of November, 2013, I, William Crampton and Linda Li, ceased to own shares in Training Beam Education, Ltd." (Defs.' Mem. 19.) Defendants also point to an unsworn statement filed on June 25, 2016 following this Court's order directing counsel for TBE to provide documents clarifying TBE's corporate status, wherein Xie alleged that she purchased all of Crampton and Li's interests in TBE on August 20, 2012. (Defs.' Mem. 19-20.) Based on this, Defendants argue that it is clear that Crampton was not authorized to move to intervene on behalf of TBE when the intervention motion was filed in September 2012.

Contrary to Defendants' view, I find that the evidence does not conclusively demonstrate whether Crampton had the requisite authority to act on behalf of TBE at the time the motion to intervene was filed. Indeed, it is not clear whether TBE was at some point dissolved—and if so when—or whether and when Crampton and/or Li were shareholders of TBE and thus authorized to move for intervention on its behalf.[16] Considering these facts in the light most favorable to TBE, I find that there is a question of fact as to whether and when Crampton served in the appropriate capacity to authorize TBE to move to intervene in this matter. Accordingly, Defendants' motion for summary judgment on this ground is denied.

---

[16] Crampton has submitted several post-discovery statements. In particular, in a declaration in opposition to summary judgment, Crampton writes that "[m]y wife Linda Li and I owned and ran TBE until we sold it in August 2012" and that he was authorized by Xie to intervene and sue Defendants. (Doc. 266 ¶ 2.) Crampton also seeks to clarify or alter his deposition testimony by writing that his "testimony in response to a deposition question regarding whether the company was 'dissolved' in 2012 was not understood by [him] to refer to legal dissolution, but rather that Linda and [he] no longer owned and managed TBE as of August 2012." (*Id.*) In addition to Crampton's declaration, Xie also submitted a declaration stating that she purchased the interests in TBE from Crampton and Li and that Crampton was authorized to act on behalf of her and the company. (*See* Doc. 265.) Defendants suggest that these allegations cannot be considered because they were proffered for the first time in affidavits opposing summary judgment that contradict the deposition testimony of one of the affiants. (Defs.' TBE Reply 4.) However, even without considering these additional materials, and relying solely on the evidence produced during discovery, I find that a question of fact exists and that summary judgment is inappropriate. "Defs.' TBE Reply" refers to Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed on December 29, 2017. (Doc. 271.)

**D.** *TBE's Claims for Breach of Contract and Unjust Enrichment*

Defendants move for summary judgment with regard to TBE's claims for breach of contract and unjust enrichment pertaining to the China License Agreement. I address these claims below.

### 1. Breach of Contract

#### a. Applicable Law

As outlined above, the elements of breach of contract under New York law are well established: "(1) the existence of a contract between [the plaintiff] and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach." *Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 186 (2d Cir. 2007). A breach is material if it "go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc*., 111 F.3d 284, 289 (2d Cir. 1997). The non-breaching party must choose between two remedies—it can elect to terminate the contract and recover liquidated damages or it can continue the contract and recover damages solely for the breach. "Once a party elects to continue the contract, it can never thereafter elect to terminate the contract based on that breach, although it retains the option of terminating the contract based on other, subsequent breaches." *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 387–88 (S.D.N.Y. 1999).

b. <u>Application</u>

In its amended complaint, TBE alleges that Defendants breached the China License Agreement because Defendants refused to continue the relationship with TBE, conducted business with other Chinese entities, and ultimately unilaterally terminated the agreement.  In support of summary judgment, Defendants argue that these claims should be dismissed because TBE breached the agreement first by failing to make certain required payments under the agreement.[17]

The China License Agreement required TBE to make four separate payments at specified periods throughout 2011 and 2012.  (CLA 4.)  TBE made the first two payments but failed to make any subsequent payments.  Defendants assert that because TBE declined to issue the final two payments before Defendants repudiated the contract, TBE breached the agreement first and therefore cannot recover on a breach of contract claim against Defendants.  (*See* Defs.' TBE Reply 7 (quoting *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 670 (S.D.N.Y. 1996) (stating that a "party who has committed a material breach first cannot claim a subsequent breach by the other party")).)  In response, TBE contends that its failure to make the final payments under the contract was justified because, among other reasons, "Reiman told TBE on a number of occasions that she was suing to dissolve the Agreement, which constituted a repudiation of the Agreement."  (TBE Opp. 18.)[18]

It is well established that a party's duty to perform under a contract is excused when the other party repudiates the agreement.  *See, e.g.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,

---

[17] Defendants also claim that TBE's breach of contract claim cannot stand because TBE cannot demonstrate actual damages.  (Defs.' Mem. 21.)  This argument fails for the same reason outlined above with respect to Defendant's motion for summary judgment to dismiss Plaintiff's breach of contract claims.  *See supra* Part IV.B.2.

[18] "TBE Opp." refers to TBE's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed on November 27, 2017.  (Doc. 263.)

404 F.3d 566, 587 (2d Cir. 2005). Thus, if Defendants did express an intent not to perform under the contract, TBE may have been justified in withholding the final payments and the withholding would not constitute a breach. Because, as discussed above, there is a question of fact as to whether Defendants anticipatorily repudiated the China License Agreement, *see supra* Part IV.B.1, I cannot conclude that TBE was the first party to breach the contract such that it is precluded from pursuing a breach of contract claim against Defendants.[19]

Accordingly, Defendants' motion for summary judgment with regard to TBE's breach of contract claim is denied.

## 2. Unjust Enrichment

Defendants maintain that TBE's cause of action for unjust enrichment should be dismissed because it is duplicative of the breach of contract claim. (Defs.' Mem. 22.) I disagree.

### a. Applicable Law

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). Unjust enrichment is a quasi-contract claim that the law creates in the absence of any agreement between the parties. *Id.* at 586–87. Accordingly, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in [unjust enrichment] for events arising out of the same subject matter." *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005); *accord Beth Israel*, 448 F.3d at 587.

---

[19] Because I deny summary judgment based on TBE's argument that Defendants anticipatorily breached the agreement, I do not address TBE's other arguments for why its failure to make the final payments was justified.

b. <u>Application</u>

TBE alleges that the China License Agreement was procured by fraud. (TBE Opp. 20.)
"[A] claim for unjust enrichment is not duplicative of a breach of contract claim where the
plaintiff alleges that the contracts were induced by fraud," *Rodriguez v. It's Just Lunch, Int'l*, No.
07 Civ. 9227(SHS), 2013 WL 1749590, at *5 (S.D.N.Y. Apr. 23, 2013) (quoting *Pramer S.C.A.
v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 161 (1st Dep't 2010)); *see also Lefkowitz v. Reissman*,
No. 12 Civ. 8703(RA), 2014 WL 925410, at *12 (S.D.N.Y. Mar. 7, 2014) (noting that fraudulent
inducement claim rendered controlling contract "potentially voidable").

Accordingly, Defendants' motion for summary judgment as to TBE's unjust enrichment
claim is denied.

**E.      *TBE's Claim for Fraudulent Inducement***

TBE alleges in its third cause of action that "Defendants AHA and Reiman induced TBE
into the China License Agreement based upon the false material representation that Defendants
had an existing physical school premises [and] that AHA was planning to build a second
physical school premises." (TBE Am. Compl. ¶¶ 81–93.)[20] Defendants move for summary
judgment on this claim, arguing that the record does not support TBE's claim and that it fails as a
matter of law. I agree.

**1.  Applicable Law**

"Under New York law a person who induces another to enter into a contract by
misrepresenting a material fact or making a promise that he or she has no intention of keeping
may be held liable in damages for fraud." *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037,
1043 (2d Cir. 1986). In order to establish a claim for fraud, the moving party must demonstrate

---

[20] "TBE Am. Compl." refers to TBE's First Amended Intervenor Complaint, filed on May 19, 2014. (Doc. 99.)

"(1) representation of a material existing fact; (2) falsity of the statement; (3) scienter; (4) deception; and (5) injury." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 295 (2d Cir. 1986) (internal quotation marks omitted).

A party's claim of fraudulent inducement can be sustained without reference to direct evidence of fraudulent intent if the party provides evidence of facts that support a "strong inference that the defendants possessed the requisite fraudulent intent." *Cosmas v. Hassett*, 886 F.2d 8, 12–13 (2d Cir. 1989). Fraudulent intent "is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference arising therefrom." *Goshen Litho, Inc. v. Kohls*, 582 F. Supp. 1561, 1564 (S.D.N.Y. 1983). New York courts have denied summary judgment where a plaintiff demonstrated the existence of specific facts from which a jury might infer that defendants engaged in a scheme or plot to defraud. *See NL Grp. v. Eccelston Props., Ltd.*, 577 N.Y.S.2d 66, 67 (N.Y. 1991). However, fraudulent intent cannot be inferred solely from a defendant's failure to perform on the contract. *Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87 Civ. 6125(KMW), 1992 WL 309613, at *11 (S.D.N.Y. Oct. 15, 1992). Additionally, a party's "failure to fulfill promises to perform future acts, absent an intent not to perform at the time the promise was made [is] insufficient ground[ ] for alleging fraud." *De Jesus v. Sears, Roebuck & Co.*, No. 93 Civ. 2605, 1995 WL 122726, at *3 (S.D.N.Y. Mar. 22, 1995) (internal quotation marks omitted)); *see also Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).

## 2. Application

TBE asserts that its business model was dependent on AHA having a brick and mortar school in the United States and that Defendants misled TBE into believing that AHA operated a school on Hilton Head Island and that AHA intended to build another brick and mortar school

elsewhere in the United States in the future.  Defendants maintain that no evidence has been unearthed in discovery to definitively prove TBE's fraud claim concerning the presence of a physical school on Hilton Head Island.

Defendants assert that Crampton's deposition testimony makes clear that Defendants made no representations to TBE about the existence of a physical school.  For instance, Crampton testified that he was never told that a physical school existed but merely assumed it existed because use of the word "academy" on AHA's website suggested the presence of a physical school.  (Crampton Dep. 51:10-52:18; 87:4-88:3.)[21]  Crampton also testified that he never discussed with Milea whether AHA had a physical school, (*id.* at 54:18-25), and that Milea told him he hoped there would be a "new" school but never stated there was an existing school, (*id.* at 83:9-16, 88:4-17).  Additionally, Crampton testified that during an initial meeting with Li, Reiman, and Milea, he could not recall whether there was any discussion of the existence of a physical AHA school.  (*Id.* at 71:11-14.)  Indeed, Crampton stated that "everything that we heard was that the range or the number of students that could be hosted in [AHA's] current location was not large, and what we needed to achieve the numbers that we all hoped for was a much larger . . . capacity.  That was the new school.  That's what everyone was thinking and talking about.  That's what we all hoped for."  (*Id.* at 91:6-14.)

In addition, emails exchanged after the China License Agreement was executed also suggest that TBE understood that no physical school was located on Hilton Head Island.  In a March 8, 2012 email, Li stated that "[w]e signed [the agreement] because [Reiman] and [Milea] promised us you will have a real campus by the end of year 2011."  (Schonfeld Decl., Ex. R at

---

[21] "Crampton Dep." refers to the transcript of the February 18, 2016 deposition of William Crampton, attached as Exhibit K to the Declaration of Simcha D. Schonfeld, Esq. in Support of Defendants' Motion for Summary Judgment.  (Doc. 248-14.)

408.)[22]  In another email from March 8, 2012, Li stated that she had told her partners that AHA had a real campus "because we thought you will finish before this summer," not because any claim was made that one existed when the China License Agreement was executed.  (*Id.* at 411.)

Furthermore, none of the evidence proffered by TBE demonstrates that Defendants represented that AHA operated a school on Hilton Head Island.  As support for its argument, TBE primarily relies on two passages from Crampton's deposition testimony.  (*See* TBE Opp. 16–17.)  In the first passage, Crampton states that when he asked Reiman "Where do your students live?" she replied "that they have housing for them."  (Crampton Dep. 71:5-25.)  In the second passage, Crampton indicates that, during an initial meeting with Reiman, he asked her whether AHA had a "physical location," to which Reiman said yes.  (*Id.* at 87:11-19.)  These passages, at best, suggest that Defendants informed TBE that AHA maintained a physical presence on Hilton Head, but not that it operated a school on the island.  Thus, considering all of the documentary evidence, there is no support for the premise that Defendants misrepresented to TBE that a school or campus existed at the time the China License Agreement was entered.[23]

Regarding the construction of a new brick and mortar school, TBE supports its fraud claim by relying on "Reiman's misrepresentation that AHA was in the process of actually building a new school."  (TBE Opp. 14.)  TBE claims that, during various conversations in and

---

[22] "Schonfeld Decl." refers to the Declaration of Simcha D. Schonfeld, Esq. in Support of Defendants' Motion for Summary Judgment, filed on October 4, 2017.  (Doc. 248.)

[23] I note that Crampton's declaration submitted in opposition to Defendants' motion for summary judgment contradicts his deposition testimony that in a meeting with Reiman and Milea in May of 2011, Reiman stated that AHA had a school in South Carolina.  However, in light of the self-serving nature of this declaration, I afford the declaration and these newly submitted statements no weight.  *See Mancuso v. Consolidated Edison Co. of N.Y.*, 130 F. Supp. 2d 584, 592 (S.D.N.Y. 2001) (opining that a party cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . and may not submit self-serving affirmations that contradict prior testimony asserted in depositions, interrogatories, and affidavits"); *see also Brock Enters. Ltd. v. Dunham's Bay Boat Co., Inc.*, 292 A.D.2d 681, 683 (3d Dep't 2002) ("[A] party cannot avoid summary judgment by alleging issues of fact created by self-serving affidavits contradicting prior sworn deposition testimony." (internal quotation marks omitted)).

around May 2011, Reiman stated that AHA planned to build a new school that would be able to host a large number of Chinese students.  (*Id.* at 15.)  Nevertheless, TBE points to no evidence—and I find none—demonstrating that Defendants entered the China License Agreement intending that the new school would never be built.  Rather, the evidence suggests that at the time the China License Agreement was entered into, Defendants intended to build a new school but that, following execution of the agreement, the school never came to fruition.  (*See, e.g.*, Crampton Dep. 162:19-21 ("I don't think the representation [to build a new school] was false.  They were planning a school, as far as I knew.").)

Failure to fulfill a promise to perform future acts, absent an intent not to perform at the time the promise was made does not constitute fraud.  *See Cohen*, 25 F.3d at 1172; *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995) ("[M]ere non-performance of promises is insufficient to create an inference of fraudulent intent." (internal quotation marks omitted)).  Although fraudulent intent "may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident," *Powers*, 57 F.3d at 185, there is no evidence to support that such was the case here.

Accordingly, TBE's claim for fraudulent inducement fails and Defendants' motion for summary judgment on this claim is granted.

## V.    Conclusion

For the reasons stated herein, Defendants' motion for summary judgment, (Doc. 247), is GRANTED IN PART AND DENIED IN PART, and Plaintiff's cross motion for partial summary judgment, (Doc. 252), is DENIED.

Defendants' request for a one day extension of time to file their motion for summary judgment, (Doc. 246), is GRANTED nunc pro tunc.

The parties are directed to appear for a post-discovery conference on April 25, 2019 at 10:30 a.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  The parties are further directed to submit a joint letter on or before April 18, 2019 setting forth proposed trial dates and the anticipated length of trial.

The Clerk of Court is respectfully directed to close the open motions at Dkt. Nos. 246, 247, and 252.

SO ORDERED.

Dated: February 14, 2019
       New York, New York

Vernon S. Broderick
United States District Judge